IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

In re:                                          )
                                                )
COX ENTERPRISES, INC. SET-TOP         )      Case No. 12-ML-2048-C
CABLE TELEVISION BOX                    )
ANTITRUST LITIGATION                    )

## MEMORANDUM OPINION AND ORDER

## I.  BACKGROUND

In 2009, multiple Cox premium cable subscribers filed class action suits in various

jurisdictions against Cox for allegedly illegally tying its premium cable service to rental of

a Cox set-top box.  At Defendant's request, the United States Judicial Panel on Multidistrict

Litigation ("JPML") consolidated these actions and transferred them to this Court for

resolution.  On December 28, 2011, the Court determined that the action could not proceed

as a nationwide class.

Counsel who had pursued the nationwide class refiled virtually identical actions

across the country.  Rather than seeking a nationwide class, each newly filed action sought

to certify a class for a specific geographic region.  The actions were again consolidated by

the JPML and transferred to this Court.  In the course of determining the most efficient

means of administration, the Court and the parties agreed to prepare for trial the case arising

in the Oklahoma City geographic market.  To that end, the parties conducted discovery and

Plaintiff now seeks class certification.  The Court conducted a class certification hearing on

November 6 and 7, 2013.  After consideration of the Motion seeking certification and the

Objection, as well as the attached exhibits and the evidence and argument offered at the hearing, the Court finds as follows:

## II. INTRODUCTION

Plaintiff filed the present suit against Defendant Cox Enterprises, Inc. ("Cox") alleging that Defendant illegally forces customers to rent a Cox set-top box ("STB") in order to gain full access to Cox's premium cable services in violation of the Sherman Act, 15 U.S.C. § 1. Plaintiff now moves the Court to certify the following class pursuant to Fed. R. Civ. P. 23:

> All persons in Cox's Oklahoma City Market who subscribed to Cox for residential Premium Cable from February 1, 2005 to the present and:
>
> (a) paid Cox a monthly rental fee equal to the Oklahoma City "rate card" charge for a recording STB (whether standard definition or high definition) including the separate "DVR Service Fee"; and/or
>
> (b) paid Cox a monthly rental fee equal to the Oklahoma City "rate card" charge for a non-recording high definition STB from February, 2005 through February, 2007 and/or February, 2010 through December, 2012; and/or
>
> (c) paid Cox a monthly rental fee equal to the Oklahoma City "rate card" charge for a non-recording standard definition STB from March 2007 through December 2007 and/or February 2012 through December 2012.[1]

Before considering the merits of the class certification request, some background into the provision of cable service is necessary.

---

[1] Plaintiff excludes the following people from his definition of the class: Plaintiff's counsel; Defendant's employees; the Court and the immediate family members and staff of the Court.

Cox is one of the five largest cable providers of multi-channel video programming distributors ("MVPD") in the United States and provides cable service to customers across the nation in 19 different states. Cox offers several different tiers of cable packages, including basic cable and digital cable. Before a customer may subscribe to digital video programming, that customer must subscribe to Cox TV Starter, formerly Cox Limited Basic ("basic cable"). Basic cable is primarily over-the-air broadcast stations, without interactive digital programming. Under Federal Communications Commission ("FCC") regulations, every cable subscriber must buy basic cable before being permitted to subscribe to premium cable.

Specific channels and digital cable tiers available to customers vary across Cox's national footprint, as do prices. Unlike basic cable, digital programming requires customers to have a device that will unscramble the encrypted signals. One such device is an STB. STBs perform another function: They allow cable providers and their customers to communicate back and forth ("bi-directionally") so that customers can utilize features – Pay-Per-View ("PPV"), Video on Demand ("VOD"), and Interactive Programming Guide ("IPG") – that require such communication. While specific packages vary, all Cox customers who subscribe to digital video programming and rent a Cox STB have access to Cox's IPG, VOD, and PPV.

## III. CLASS CERTIFICATION STANDARD

Before a class may be certified, the Court must find that the plaintiff has satisfied the requirements of Rule 23. The first subpart of this Rule requires that

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Once Rule 23(a) has been satisfied, then the plaintiff must show that it meets one of the three types of actions under Rule 23(b). Here, Plaintiff asserts that this action fits within subpart (b)(3), which requires:

> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

Fed. R. Civ. P. 23(b).

Before deciding whether to certify a class, the Court must conduct a rigorous analysis of whether Plaintiff has met his strict burden of proof that the Rule 23 requirements have been met. <u>Rex v. Owens ex rel. State of Okla.</u>, 585 F.2d 432, 435 (10th Cir. 1978). Frequently, this analysis may involve considerations enmeshed in the factual and legal issues comprising a plaintiff's cause of action. <u>Wal-Mart Stores, Inc. v. Dukes</u>, ___ U.S. ___, 131 S.Ct. 2541, 2551 (2011). "Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule–that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." <u>Id.</u>

As part of this initial analysis, the Court will consider Defendant's challenge that the class is not ascertainable. "[A]scertainability entails two important elements. First, the class

must be defined with reference to objective criteria. Second, there must be a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." Hayes v. Wal-Mart Stores, Inc., 725 F.3d 349, 355 (3d Cir. 2013) (citation omitted). Defendant argues the proposed class fails the first element as there must be proof of coercion on an individualized basis before a customer comes within Plaintiff's proposed class. Defendant argues that as a consequence an individualized examination of each potential plaintiff is required. As for the second element, Defendant argues the class lacks a reliable or administratively feasible mechanism for determining membership.

Contrary to Defendant's arguments, the class is ascertainable. First, the definition is based on purely objective criteria. Either a customer falls within the group of Cox customers defined or it does not. As discussed more fully below, Defendant's argument for individualized determination of coercion is unsupported. As for the second element, as Plaintiff notes, Defendant's ICOMs data easily identifies each item necessary for inclusion or exclusion from the class. Therefore, membership is administratively feasible. The Court finds the class as proposed by Plaintiff ascertainable and the discussion will turn to the Rule 23 factors.

## IV. DISCUSSION

The first step is to determine whether the suit has been brought by "[o]ne or more members of [the] class." Fed. R. Civ. P. 23(a); Paton v. N.M. Highlands Univ., 275 F.3d 1274, 1278 (10th Cir. 2002). The named Plaintiff, Richard Healy, lives in Cox's Oklahoma

City Market and subscribed to Cox for residential Premium Cable within the proposed class period. Further, Mr. Healy paid Cox a monthly rental fee equal to the Oklahoma City "rate card" charge for one or more STBs during the class period. Accordingly, the Court finds the suit has been brought by one or more member of the class.[2] The analysis of whether Plaintiff has satisfied Rule 23's requirements will proceed.

## A. Rule 23(a)

### 1. Numerosity

To satisfy this element, "[t]he burden is upon plaintiffs seeking to represent a class to establish that the class is so numerous as to make joinder impracticable." Peterson v. Okla. City Hous. Auth., 545 F.2d 1270, 1273 (10th Cir. 1976). The Tenth Circuit has not adopted a set number as presumptively sufficient to meet this burden, and there is "'no set formula to determine if the class is so numerous that it should be so certified.'" Trevizo v. Adams, 455 F.3d 1155, 1162 (10th Cir. 2006) (quoting Rex v. Owens ex rel. State of Okla., 585 F.2d 432, 436 (10th Cir. 1978)). Whether a class satisfies the numerosity requirement is "a fact-specific inquiry" that district courts have "wide latitude" when determining. Id.

Here, the proposed class includes several thousand current or former Cox customers, within the Oklahoma City market, who subscribed to premium cable and rented a Cox STB. Defendant argues that the number cannot be determined because it must first be determined how many of those members preferred to purchase rather than rent an STB. Defendant's

---

[2] To the extent Defendant challenges Mr. Healy as a class representative based on the time frame of his membership in the class, that issue will be addressed below.

argument misses the point. Nothing in the class definition distinguishes between customers who prefer to buy rather than rent an STB.

Considering the large number of class members in the geographic area, the Court finds Plaintiff has established that the number is too great to render individual joinder of the class members practicable. Accordingly, Plaintiff has satisfied the requirements of Rule 23(a)(1).

## 2. Commonality

This requirement is generally established when the plaintiff's claims have "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). However, it is not enough to allege that all members of the class "have . . . suffered a violation of the same provision of law." <u>Dukes</u>, ___ U.S. at ___, 131 S. Ct. at 2551. Rather, the plaintiff must prove a common contention that can be remedied with classwide resolution. "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" <u>Id.</u> (quoting <u>Gen. Tel. Co. of Southwest v. Falcon</u>, 457 U.S. 147, 157 (1982)). For purposes of commonality, "'"[e]ven a single [common] question will do."'" <u>Id.</u> at 2556 (alterations in original) (quoting <u>id.</u> at 2566 n.9 (Ginsburg, J., dissenting)).

Here, the same practices–namely, the alleged tie that Cox customers are required to rent a Cox STB to access Cox's Premium Cable programming–"touch and concern all members of the class" (<u>id.</u> at 2566 n.7 (Ginsburg, J., dissenting)). The complained-of conduct is a common practice that Cox applied to all members of the class, regardless of what specific package they subscribed to. It is this conduct that serves as the basis for

Plaintiff's illegal tying claim, and the resolution of multiple elements of this claim would be common to the class.

Defendant argues that commonality is not shown, as Plaintiff has failed to identify any contractual term or internal policy mandating the alleged tie. Defendant further argues that even if Plaintiff had made that showing, he has still failed to establish that the proposed class members believed such a policy existed or that they had seen any Cox documents demonstrating the tie. The evidence presented by Plaintiff clearly establishes that Cox policy required rental of an STB to obtain "Premium Cable." Further, to come within the class definition, the class member must necessarily have purchased "Premium Cable" and rented an STB.

Because a common question–whether Cox illegally tied access to some portions of its programming (namely Premium cable) to rental of a Cox STB–arises as to all members of the class and a classwide proceeding will generate a common answer that drives the resolution of the litigation, the requirements of Rule 23(a)(2) are satisfied.[3] Dukes, ___ U.S. at ___, 131 S.Ct. at 2551.

---

[3] "In a class action brought under Rule 23(b)(3), the 'commonality' requirement of Rule 23(a)(2) is 'subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class predominate over' other questions." Lienhart v. Dryvit Sys., Inc., 255 F.3d 138, 146 n.4 (4th Cir. 2001) (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 609 (1997)). The Rule 23(b)(3) predominance requirement is "far more demanding" than Rule 23(a)(2)'s commonality requirement. Amchem Prods., 521 U.S. at 624.

### 3. Typicality

Rule 23(a)'s commonality and typicality requirements "tend to merge," and both facilitate the determination of "whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." <u>Falcon</u>, 457 U.S. at 157-58 n.13. Typicality is satisfied when the class representatives' claims and proposed class members' claims are "based on the same legal or remedial theory." <u>Adamson v. Bowen</u>, 855 F.2d 668, 676 (10th Cir. 1988). Moreover, "differing fact situations of class members do not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and class members are based on the same legal or remedial theory." <u>Id.</u> Here, Plaintiff complains of one policy or conduct that he alleges amounts to an illegal tie. That policy or conduct is the same for Plaintiff and the proposed class members. Thus, each have the same legal claim.

Defendant counters, arguing that Plaintiff is not typical for four reasons. First, his membership in the class began in 2007, some two years after the start of the proposed class; second, Plaintiff first subscribed to Premium Cable after the integration ban went into effect and therefore Defendant has different defenses to him as to other class members; third, Plaintiff has multiple MVPD options at his home unlike other potential class members; and fourth, Plaintiff did not see the allegedly coercive statements in the STB rental policy.

It is clear that at least for some portion of the class period, Plaintiff is a member. It is also clear that Plaintiff faced the same alleged illegal tie as that faced by other members

of the proposed class. Defendant relies on <u>Braden v. Wal-Mart Stores, Inc.</u>, 590 F. Supp. 2d 1159 (W.D. Mo. 2008) to argue that Plaintiff lacks standing. As Plaintiff notes, the Eighth Circuit reversed the district court decision on that point in <u>Braden v. Wal-Mart Stores, Inc.</u>, 588 F.3d 585, 593-95 (8th Cir. 2009). As the circuit court noted in <u>Braden</u>, the issue of standing hinges on whether the class representative has alleged an injury in fact that is causally related to the conduct he seeks to challenge on behalf of the class. <u>Id.</u> at 593. As Plaintiff's claim meets this criteria, he has standing and Defendant's first argument against typicality is without merit.

Defendant's second argument focuses on its defenses based on whether the class member was a subscriber before or after the integration ban became effective. Defendant offers a conclusory statement that it has different defenses to subscribers who subscribed before that ban was effective. The integration ban required cable operators to move entirely to CableCARD-enabled STBs. How that creates an individualized defense for Defendant is unclear and undeveloped by Defendant. In the absence of such evidence, the Court will not deny a class on this basis.

Defendant's third and fourth arguments do not affect typicality. Whether a customer has different MVPD options goes only to the issue of market power. As will be discussed below, the Court finds for purposes of class certification that Defendant has market power. Likewise, the issue of coercion is not as narrowly defined as proposed by Defendant. As will be discussed in a later section, this element is subject to common proof.

Plaintiff has satisfied the requirements of Rule 23(a)(3).  DG ex rel. Stricklin v. Devaughn, 594 F.3d 1188, 1199 (10th Cir. 2010) (finding that "typicality exists where, as here, all class members are at risk of being subjected to the same harmful practices, regardless of any class member's individual circumstances.").  Nor does the fact that there may be a damage disparity mean that the claims of the class representatives and the class members are atypical.  Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1764, at 266-69 & n.13 (3d ed. 2005); see Milonas v. Williams, 691 F.2d 931, 938 (10th Cir. 1982).  Plaintiff's and the class members' claims are based on the same legal theories and arise from the same pattern of conduct by Defendant.  Accordingly, Plaintiff has satisfied this requirement.

### 4. Adequacy

Adequacy of representation depends on resolution of two questions:  "'(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'"  Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d 1180, 1187-88 (10th Cir. 2002) (quoting Hanlon v. Chrysler Corp., 150 F.3d 1011, 1020 (9th Cir. 1998)).  Lanner v. Wimmer, 662 F.2d 1349, 1357 (10th Cir. 1981) ("It is not fatal if some members of the class might prefer not to have violations of their rights remedied.") (internal quotation marks and citations omitted).

Defendant's challenges to this element are discussed in Sec. A.3., Typicality, above. After consideration of the facts before it, the Court finds Plaintiff is an adequate

representative for the putative class.  In 2003, Rule 23 was amended so that the determination of whether class counsel would fairly and adequately represent the class occurs after the class has been certified. Fed. R. Civ. P. 23(g).  Nevertheless, Plaintiff has offered argument in support of his counsel being appointed as class counsel, and Defendant did not offer any objection thereto.

Because the requirements of Rule 23(a) have been met, Plaintiff must now establish that the case fits into one of the three categories under Rule 23(b).  Here, Plaintiff alleges the case satisfies the requirements of Rule 23(b)(3).

## B.  Rule 23(b)(3)

Under this subpart, Plaintiff must show that common issues will predominate over any individualized issues and that a class action is the superior method for adjudicating the action.  Rule 23(b)(3) points to the following factors when making this determination:  "the class members' interests in individually controlling the prosecution . . . of separate actions; . . . the extent and nature of any litigation concerning the controversy already begun by . . . class members; . . . the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and . . . the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)-(D).

### 1.  Whether Common Issues Predominate

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623 (1997).  In order to determine whether common issues will

predominate over individualized issues, the underlying elements of the substantive claim–here, the tying claim–must be identified. See, e.g., Alabama v. Blue Bird Body Co. Inc., 573 F.2d 309, 316 (5th Cir. 1978); Freeland v. AT&T Corp., 238 F.R.D. 130, 142 (S.D.N.Y. 2006) ("In making [the predominance] determination, a court considers whether the putative class members 'could establish each of the . . . required elements of [their] claim[s] . . . using common evidence'" (quoting In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 136 (2d Cir. 2001), superseded by statute on other grounds, Fed. R. Civ. P. 23, as recognized in Attenborough v. Constr. & Gen. Bldg. Laborers' Local 79, 238 F.R.D. 82, 100 (S.D.N.Y. 2006), and overruled on other grounds by In re Initial Pub. Offerings Sec. Litig., 471 F.3d 24, 40 (2d Cir. 2006))).

Defendant argues that commonality does not exist because it may have unique defenses to certain class members. In particular, Defendant argues that for certain class members the "filed rate doctrine" will preclude their claims of overcharge. Plaintiff argues this position is a red herring as Defendant always charged rates below the "Maximum Permitted Rate." Plaintiff also argues that regardless of application of the doctrine, his class may proceed as that defense in and of itself does not establish that individual issues predominate over classwide issues. Finally, Plaintiff argues that TON Services, Inc. v. Qwest Corp., 493 F.3d 1225 (10th Cir. 2007), precludes Defendant's reliance on the filed rate doctrine.

Considering first Plaintiff's reliance on TON Services, as Defendant notes in its Sur-Reply, that case does not support Plaintiff's argument. The facts leading to the Circuit's

decision in that case make it clear that it is factually inapposite to the present case. It was the failure to file rates at all rather than a difference in the rates filed compared to those charged that led the Circuit to find the filed rate doctrine inapplicable.

Nevertheless, the filed rate doctrine is not a bar to Plaintiff's class. Even after <u>Dukes</u>, <u>Comcast v. Behrend</u>, ___ U.S. ___, 133 S.Ct. 1426 (2013), and the other cases cited by Defendant, the predominance inquiry asks whether "'questions of law or fact common to class members predominate over any questions affecting only individual members.'" <u>Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.</u>, 725 F.3d 1213, 1217 (10th Cir. 2013) (<u>quoting</u> Rule 23(b)). Defendant offers no evidence that the number of members subject to the rate doctrine is so great that those issues will predominate over the issues for the remainder of the class. As Plaintiff notes, Defendant's own documents track those members who could be subject to the doctrine. In the event the Court finds the doctrine applicable, adjustment of the class is relatively straightforward.

### a. The Tying Claim

In order to establish a violation of § 1, a party must show the existence of "'a contract, combination or conspiracy that unreasonably restrains trade in the relevant market.'" <u>Full Draw Prods. v. Easton Sports, Inc.</u>, 182 F.3d 745, 756 (10th Cir. 1999) (<u>quoting</u> <u>TV Commc'ns Network, Inc. v. Turner Network Television, Inc.</u>, 964 F.2d 1022, 1027 (10th Cir. 1992)); <u>Spectrum Sports, Inc. v. McQuillan</u>, 506 U.S. 447, 458 (1993) ("The purpose of the [Sherman] Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market.").

To succeed on his tying claim, Plaintiff must establish the following elements: (1) two separate products or services are involved; (2) the sale or agreement to sell one product or service is coerced or conditioned upon the purchase of another; (3) the seller has sufficient power in the tying product market to enable it to restrain trade in the tied product market; and (4) a not insubstantial amount of interstate commerce in the tied product is affected. Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc., 63 F.3d 1540, 1546 (10th Cir. 1995). Additionally, Plaintiff must establish that the class has suffered an antitrust injury or impact.

"Tying arrangements are unlawful '[b]ecause they deny competitive access to the tied product market on the basis of the seller's leverage in the tying product market, and force buyers to forego free choice between sellers.'" Abraham v. Intermountain Health Care, Inc. 461 F.3d 1249, 1264 (10th Cir. 2006) (alteration in original) (quoting Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc., 585 F.2d 821, 834 (7th Cir. 1978)). "[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product." Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 12 (1984), abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc., 547 U.S. 28, 31 (2006).

## I.  Separate Tying and Tied Products

"[T]he test for determining whether two components are separate products turns not on their function, but on the nature of any consumer demand for them." Multistate Legal Studies, Inc., 63 F.3d at 1547. "For two items at issue to be considered distinct products,

'there must be sufficient consumer demand so that it is efficient for a firm to provide [one] separate from [the other].'" Id. (quoting Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 462 (1992)). "'The courts uniformly consider the issue whether the tying arrangement consists of separate tying and tied products to be common to all members of the class.'" In re Visa Check/Mastermoney Antitrust Litig., 192 F.R.D. 68, 87 (E.D.N.Y. 2000) (quoting Herbert Hovenkamp, Tying Arrangements and Class Actions, 36 Vand. L. Rev. 213, 220 (1983)).

Plaintiff defines the tying product as premium cable, or Advanced TV, and the tied product as the basic STBs. Defendant offers no argument that these products are not separate. The Court finds no basis to alter the conclusion reached in the Nationwide Class Certification Order which found Plaintiff had established that premium cable and STBs are separate products.

### ii. Condition or Coercion

Often, coercion is one of the determinative elements in evaluating whether common evidence predominates in tying claims. When the alleged restraint is in a written agreement, such as a contractual provision requiring purchase of the tied product, many courts have found that common proof predominated and class certification was appropriate. See Bogosian v. Gulf Oil Corp., 561 F.2d 434, 452 (1977); In re Visa Check, 192 F.R.D. at 88 ("[I]n cases such as this one, in which the alleged tie is the product of an undisputed contractual provision, the 'requisite coercion' is established."); see George Lussier Enters., Inc. v. Subaru of New England, Inc., No. Civ. 99-109-B, 2001 WL 920060, at *11-12

(D.N.H. Aug. 3, 2001). Likewise, when no contract exists and common proof of coercion was lacking, many courts have found that coercion must be shown on an individual basis, rendering class certification inappropriate. Hewitt v. Joyce Beverages of Wis., Inc., 721 F.2d 625, 628-29 & nn.2-3 (7th Cir. 1983); Abrams v. Interco Inc., 719 F.2d 23 (2d Cir. 1983); Ungar v. Dunkin' Donuts of Am., Inc., 531 F.2d 1211, 1226 & n.17 (3d Cir. 1976).

Plaintiff does not claim that Cox contractually ties the products. Rather, Plaintiff focuses on Defendant's conduct with customers, its internal policies and procedures, and evidence that customers almost universally rent an STB when purchasing Premium Cable.

Defendant argues that because no written contract exists requiring the purchase of the tied product, individualized proof is necessary to prove coercion in this case. (Def.'s Br., Dkt. No. 181, at 23-24.) Defendant contends that in a practical effects tying case, coercion can only be established by deposing each class member to discern whether each was forced to rent a Cox STB. As support for its conclusion that coercion can only be proven with individualized proof, Defendant cites Freeland, 238 F.R.D. 130, where the district court found class certification of the plaintiffs' tying claim improper. Here, however, unlike the defendant in Freeland, Defendant's internal policies on sales and the materials available to customers/class members all state that rental of an STB is required in order to receive full access to all interactive digital features. Freeland, 238 F.R.D. at 154 (describing that coercion is subject to generalized proof in two circumstances: (1) when the policy of conditioned sales is admitted to by the defendant; and (2) when a contractual provision requiring the tie applies to all members of the class); see also Hill v. A-T-O, Inc., 535 F.2d

1349, 1355 (2d Cir. 1976) (describing the defendants' admission "to a policy of never offering the FBP buying plan membership separately from the sale of the Compact cleaner"). (Def.'s Br., Dkt. No. 181, at 26.)

As the Court found when considering the nationwide class, although there is no contractual provision requiring that Cox customers rent a Cox STB, there is direct, common evidence of classwide policies, practices, and statements that Cox customers had to rent a Cox STB in order to participate in the full panoply of digital services.[4] Accordingly, Plaintiff has established that coercion is amenable to proof on a classwide basis.

### iii. Market Power

"[I]n all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product." Ill. Tool Works, 547 U.S. at 46. "Market power is the power 'to force a purchaser to do something that he would not do in a competitive market.'" Kodak, 504 U.S. at 464 (quoting Jefferson Parish, 466 U.S. at 14). "It has been defined as 'the ability of a single seller to raise price and restrict output.'" Id. (quoting Fortner Enters., Inc. v. U.S. Steel Corp., 394 U.S. 495, 503 (1969); United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 391 (1956)). Evaluation of the relevant

---

[4] Chase Parkway Garage, Inc. v. Subaru of New England, Inc., 94 F.R.D. 330, 331 (D. Mass. 1982) (agreeing with the Third Circuit's analysis in Bogosian v. Gulf Oil Corp., 561 F.2d 434 (3d Cir. 1977), "that proof of coercion on an individual basis was not required where a seller expressly conditioned the sale of one product upon the purchase of another"); Ungar, 531 F.2d at 1222, 1226 & n.17 ("With regard to the doctrine of individual coercion we believe it is open to us to reject it, as the district court did, or to accept it. Having in mind the particular factual complex before us, we choose the latter course. . . . Where, as here, plaintiff franchisees place no reliance on express contractual tie-ins, each, individually, must prove that his purchases were coerced as an element of establishing a prima facie case of illegal tying.").

market requires evidence of both a product market and geographic market.  <u>Lantec, Inc. v. Novell, Inc.</u>, 306 F.3d 1003, 1026 (10th Cir. 2002).

> "There is no subject in antitrust law more confusing than market definition. One reason is that the concept, even in the pristine formulation of economists, is deliberately an attempt to oversimplify—for working purposes—the very complex economic interactions between a number of differently situated buyers and sellers, each of whom in reality has different costs, needs, and substitutes . . . ."

<u>Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.</u>, 305 F.3d 1124, 1131 (10th Cir. 2002) (<u>quoting</u> <u>SCFC ILC, Inc. v. Visa USA, Inc.</u>, 36 F.3d 958, 966 (10th Cir. 1994) (internal quotation marks, citations, and alterations omitted in original)).

### (a)  Product Market

The product market is defined by reference to the "reasonable interchangeability of use or the cross-elasticity of demand between the product [in question] and substitutes for it."  <u>Brown Shoe Co., Inc. v. United States</u>, 370 U.S. 294, 325 (1962); <u>see also</u> <u>Telecor</u>, 305 F.3d at 1131.  "'Interchangeability implies that one product is roughly equivalent to another for the use to which it is put; while there may be some degree of preference for the one over the other, either would work effectively.'"  <u>Queen City Pizza, Inc. v. Domino's Pizza, Inc.</u>, 124 F.3d 430, 437 (3d Cir. 1997) (<u>quoting</u> <u>Allen-Myland, Inc. v. Int'l Bus. Machs. Corp.</u>, 33 F.3d 194, 206 (3d Cir. 1994) (internal quotations omitted in original)).  Factors to be considered include price, use, and qualities.  <u>Id.</u>  "'Cross-elasticity of demand is a measure of the substitutability of products from the point of view of buyers.  More technically, it measures the responsiveness of the demand for one product to changes in the price of a

different product." Id. at 438 n.6 (quoting E. Thomas Sullivan & Jeffrey L. Harrison, Understanding Antitrust and Its Economic Implications 217 (1994)).

Plaintiff argues that the relevant product market includes Premium Cable from Cox, MVPD services from the two satellite providers, Dish Network and DirectTV, and AT&T's U-verse service. Plaintiff argues that common evidence establishes these services as the relevant product market. Plaintiff argues that Defendant's attempts to insert the consumer's subjective perception of what is "reasonably interchangeable" with premium cable are in error. Rather, Plaintiff argues, this test is determined utilizing cross-elasticity of demand, not individual consumer's purchasing preferences. Defendant contends that Plaintiff's description of the tying product as premium cable and the tied product as STBs ignores the various cable packages available. Because of this variance, Defendant argues, the relevant product market definition cannot be proven with evidence common to the class. Rather, Defendant argues that in order to determine the appropriate product market, consumers' different interests must be considered.

As the Court noted in the Nationwide Class Certification Order, such an in-depth review of individual consumers' preferences is not necessary to determine the relevant product market. In re Live Concert Antitrust Litig., 247 F.R.D. 98, 127 (C.D. Cal. 2007) (stating that "the 'least reliable' evidence in predicting the effects of a hypothetical price increase is "'subjective'" testimony by customers that they would or would not defect in response to a given price increase'" (quoting Areeda & Hovenkamp, Antitrust Law ¶ 538b)). "[W]hen calculating the cross-elasticity of demand, economists examine the aggregate

20

demand of consumers as represented by a demand curve rather than the purchasing decisions of an individual consumer." Id. For present purposes, it is enough that evidence common to the class will define the relevant product market.

### (b) Geographic Market in Tying Product

"The geographic market is '"the narrowest market which is wide enough so that products from adjacent areas . . . cannot compete on substantial parity with those included in the market."'" Westman Comm'n Co. v. Hobart Int'l, Inc., 796 F.2d 1216, 1222 (10th Cir. 1986). The geographic market consists of the area of effective competition, and defining the relevant market is an issue of fact. Telecor, 305 F.3d at 1131. "The extent to which one market prevents exploitation of another market depends on the extent to which consumers will change their consumption of one product in response to a price change in another, *i.e.*, the 'cross-elasticity of demand.'" Kodak, 504 U.S. at 469. Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 893 (10th Cir. 1991).

"The size of the relevant geographic market depends on a number of factors, including '[p]rice data and such corroborative factors as transportation costs, delivery limitations, customer convenience and preference, and the location and facilities of other producers and distributors.'" Lantec, 306 F.3d at 1027 (quoting T. Harris Young & Assocs., Inc. v. Marquette Elecs., Inc., 931 F.2d 816, 823 (11th Cir. 1991). "In other words, 'the outer boundary of the relevant product market is reached, if one were to raise the price of the product or limit its volume of production, while demand held constant, and supply from other sources beyond the boundary could not be expected to enter promptly enough and in large

enough quantities to restore the old price or volume.'" <u>Westman</u>, 796 F.2d at 1222 (<u>quoting</u> <u>Satellite Television & Associated Res., Inc. v. Continental Cablevision of Va., Inc.</u>, 714 F.2d 351, 356 (4th Cir. 1983)).

Plaintiff contends that the relevant geographic market is Cox's Oklahoma City "subsystem." As Plaintiff notes, the Defendant considers this area as a single geographic market and its documents are full of strategies and goals for the area as if it were a single entity. As Plaintiff notes, Defendant calculates its market share across the entire region and establishes uniform policies for the area.

Defendant argues that there are vast differences within the Oklahoma City geographic area which preclude it from constituting a valid geographic market for this case. Defendant contends that Plaintiff's market analysis is divorced from a proper geographic market because it ignores the competitive variations amongst the various communities within the Oklahoma City metropolitan area.

The Court finds that the relevant geographic market is Cox's Oklahoma City "subsystem" and that this determination can be made with proof common to the class. That geographic area corresponds to the commercial realities of the MVPD industry and is economically significant. <u>Brown Shoe Co.</u>, 370 U.S. at 336-37. The area cannot be divided into smaller regions as suggested by Defendant without losing touch with the realities of competition faced by Defendant from the other providers of MVPD. To attempt to create geographic markets based on zip code, as suggested by Defendant's expert at the hearing, would ignore the commercial realities of the actions of Defendant and its competitors in the

market. Defendant offered no proof that either it or any competitor considered an area smaller than Cox's Oklahoma City "subsystem" as economically feasible to target.

Having resolved the relevant product and geographic markets, the query turns to whether or not Cox has market power. Plaintiff relies in part on Defendant's internal documents to demonstrate market power. Defendant argues these documents are used improperly, as they do not arise from a properly defined product or geographic market. As the Court has rejected Defendant's arguments on product and geographic markets, it finds that Defendant's internal documents, as presented by Plaintiff, clearly provide common evidence of market power sufficient to meet the standard required at this stage.

### iv. Substantial Amount of Commerce

Finally, Plaintiff must show that a substantial amount of commerce in the tied product is involved, which is evaluated in terms of dollar volume, not market percentage. Jefferson Parish, 466 U.S. at 16; Tic-X-Press, Inc. v. Omni Promotions Co. of Ga., 815 F.2d 1407, 1419 (11th Cir. 1987). This element was found more than satisfied when the dollar amount of commerce foreclosed by the tie was over two million dollars, with the dollar amount being measured by all sales subject to the tie, not just by the plaintiff's purchases. Fortner, 394 U.S. at 501-02. Here, Plaintiff proffers evidence, common to the class, that Cox received over 200 million dollars' worth of revenue in STB leases in the relevant market from 2005 through 2012. Accordingly, whether Cox conducted a substantial amount of interstate commerce in the STB market can be proven with common evidence.

### b. Antitrust Injury or Impact

> Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations . . . would be likely to cause."

Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977) (quoting Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 125 (1969)). "Plaintiffs seeking class certification may carry their burden of establishing that injury is subject to generalized proof by submitting an expert report that 'posits class-wide injury resulting from every single class member's overpaying for [a tied product] as a direct result of the tie.'" Freeland, 238 F.R.D. at 143 (citation omitted and alteration in original) (quoting Visa Check, 280 F.3d at 137); Bell Atl. Corp. v. AT&T Corp., 339 F.3d 294, 302 (5th Cir. 2003) ("[W]e have repeatedly held that where fact of damage cannot be established for every class member through proof common to the class, the need to establish antitrust liability for individual class members defeats Rule 23(b)(3) predominance."). All that must be shown at this stage in the proceeding is that injury is capable of proof through common evidence, which is distinguishable from actually calculating the amount of damages.

Plaintiff alleges that he suffered an antitrust impact by paying supracompetitive prices for the tied product, an overcharge imposed by Cox on STB rentals. Plaintiff's expert, Dr. Hastings, has developed a formula which determines the overcharge to class members

required to rent an STB. At the recent hearing, the parties and their witnesses debated at length the appropriateness of Dr. Hastings' calculations.

It is now clear that as anticipated by the Court in the nationwide case, questions surrounding the adequacy of an expert's opinion are relevant at the certification stage, even if that requires consideration of the merits of the case. Comcast, ___ U.S. at ___, 133 S.Ct. at 1433-34. Relying on this case and others, Defendant argues the class cannot be certified as the issue of damages is too unsettled. Of all Defendant's arguments challenging Dr. Hastings' opinions, only one is relevant at this stage. The remainder are questions related to the amount of damages that are proper. The sole issue relevant for decision at this time is whether Dr. Hastings' damage model connects the theory of liability for the class to damages calculated. Defendant argues that it does not and that under Comcast this is a fatal flaw. Id. at 1435.

Put simply, the question is, does Dr. Hastings' damages model redress the harm suffered by class members? As noted above, the proposed class seeks damages for an alleged antitrust violation. Whether that violation arises from being unable to purchase an STB or from being forced to rent one, the central issue is the same–Defendant's conduct restrains competition and its power allows it to gain an unfair profit while doing so. The damage model provides a method to redress that harm.

Contrary to Defendant's argument, the damage model in this case does not suffer from the same flaw as that in Comcast. In Comcast the plaintiff alleged four different types of anti-trust injury. Id. at 1430-31. However, the district court only found one theory amenable

to common proof.  Id. at 1431.  Despite this determination, the district court accepted the damages model even though the model calculated damages for all four theories.  It was on this basis that the Supreme Court held certification improper.  Id. at 1433.  ("There is no question that the model failed to measure damages resulting from the particular antitrust injury on which petitioners' liability in this action is premised.").

Dr. Hastings' damages model does not suffer from this flaw.  Rather, it seeks to measure the harm suffered by class members as a result of the single theory advanced by Plaintiff–illegally tying rental of an STB to the purchase of "Premium Cable."  The model further makes this determination based on evidence that is common to the class.  Whether or not the trier of fact ultimately determines the model accurately calculates damages, if any exist, is for another day.  At this stage, the Court finds Plaintiff has proffered a damages model, from a qualified witness, which uses common evidence to measure damages across the class as required by Rule 23(b)(3).

## V.  CONCLUSION

Accordingly, the Court concludes that Plaintiff has met his burden of showing this case should proceed as a class action, and, therefore, Plaintiff's Motion for Class Certification (Dkt. No. 60) is GRANTED.

IT IS SO ORDERED this 9th day of January, 2014.

ROBIN J. CAUTHRON
United States District Judge

26